The second case for argument is Mario Mancini v. United States. Good morning, Your Honors. My name is Frances Mahoney-Mosdial, and I represent Mario Mancini in this matter. May it please the Court. The facts of this case are quite straightforward. Mr. Mancini suffered an injury that required surgery. Due to a string of delays and failure to follow their own policy, as well as the lack of supervision at FCI Sandstone, all of these factors led to permanent injury and daily pain for Mr. Mancini. Minnesota Statute 145.682, I'm just going to call it the medical malpractice statute from now on, as well as Rule 702 of Federal Rules of Evidence, are relatively low standards here. At this stage, the Court must draw all reasonable inferences in Mr. Mancini's favor, and if the Court does so, it should find that these facts weigh in his favor and that Dr. Wired's affidavit has satisfied the requirements of both Rule 702 and Minnesota's medical malpractice statute. Let me throw you a little bit of a curveball, but I think it directly relates to what you just said, which is I wonder if there was even enough to survive summary judgment here. The district court focused on causation, and I think rightly so, but causation is also required to prove the underlying medical malpractice claim. And I just wonder if there's even any other evidence of causation in the record that would allow the case to go forward, even irrespective of the evidentiary rulings. Sure. So in terms of causation, I think that the expert report, while it is brief, the record is replete with genuine issues of material fact as to what caused Mr. Mancini's injury. But you have to come back forward with evidence showing the causation. Let's leave aside the expert's report. Is there anything else in the record other than the expert's report that would show causation? Sure. Mr. Mancini went to health services at FCI Sandstone many times. He reported his injury to them day after day after day. Each of these reports of pain is an opportunity for FCI Sandstone to act. That doesn't mean, though, that the failure to act necessarily led to a worse outcome for him. It doesn't necessarily mean that, but at summary judgment stage, you can't weigh competing the court shouldn't weigh competing characterization of the facts. Mr. Mancini has pled that he was ordered an urgent. Well, it's not characterization of the facts. It's evidence that supports that conclusion. And so I think the question is what's the evidence that would support that it was getting worse or that it was going to cause some damage because of the delay? Well, there is the instance in which Mr. Mancini saw Dr. Broadway, and Dr. Broadway told Mr. Mancini, if it were up to me, you would get this surgery as soon as possible. There's evidence in the record also that FCI Sandstone recommended a 60-day window for him to get that surgery, and he didn't. There's evidence that that surgery was scheduled, and due to their failure to follow their own policy, the delay was outside that 60-day window. Is that medical malpractice? I was wondering about that. So is that really medical malpractice? No medical professional had anything to do with that. That was, from what I can tell, it was an administrative error. Something wrong was put in the e-mail in terms of the date. And so I'm wondering if that's even part of a medical malpractice claim or whether that's a separate wrong that should have been sued over. Absolutely. Well, I understand that. I see that it is, in some ways, a clerical error. The buck ultimately stops with FCI Sandstone Health Services to ensure that their patients are receiving care on a timely basis. I thought I was going to sneeze, but I guess not. Counsel, this is Ted Smith. What evidence is there in the record that there was actually an aggravation to his physical condition based on the delay or based on anything that was done by the defendants, that he would have had a better outcome or would not have endured some diminution in his future function? What is there to show that the delay here and the decisions made by the defendants harmed him? Well, as we can't say what would have happened had he had the surgery with any sort of certainty, and the jurisprudence at this point doesn't require an expert to alpine as to when exactly the tipping point would be. The fact that he was administered a strength test after reporting daily pain and that an urgent MRI was ordered does indicate that FCI Sandstone was at least somewhat concerned that his state was worsening and that his strength was weakening. So I'd say that that is some indication that it would have been. And also, just the timeline of the scenario. I guess what I'm getting at is that the scenario that I typically think of in a situation like this would be if someone has a kidney disease and the evidence is such that had they gotten treated for it sooner, they would not have lost a kidney or would not have required a transplant or would not have had repercussions in other systems of their body because of the decisions and actions of the defendants. And I'm wondering, what's the corollary in the facts in this case? Yeah, absolutely. It is, you know, it's not directly comparable to that because obviously losing a kidney is sort of a binary there. The loss of strength and pain is more of a gradient. The fact is that his pain was worsening before the surgery. It was getting worse and worse day by day. While I can't point to any one fact that indicates that, you know, had it happened sooner that perhaps his pain would be less now. I'm going to even put it more bluntly, which is I have a shoulder issue from an old biking injury. It hurts. It keeps me from sleeping at night. But the doc told me, hey, it's not going to get any worse. It's just painful from that injury. So we'll see you next month at the end of next month. And I said, fine, you know, but it's not going to get any worse. And I wonder whether this injury, whether we need something more to say that this injury is not like the injury I have. I would point to the fact that Dr. Broadway told Mr. Mancini, you need this surgery. I think being told that you need surgery on a swift timeline sort of differentiates that from, you know, a doctor saying, yeah, it hurts. There's not much we can do. It's not going to get better. But don't you have to establish the applicable standard of care, that the standard of care as a person who presents in the situation of your client must be treated within seven days or something like that? And, you know, this judge, excuse me, Dr. Weyard says it doesn't meet the standard of care, but he never says what the standard of care is.  Well, I would point to a recent case in Minnesota, Ragwell v. ACR Homes Incorporated, in which the court stated that the Minnesota statute, while it does, you know, set out these baseline requirements, it does not set up a heightened standard that's beyond the regular standard of negligence, which is how a reasonable health care professional would act. And Dr. Weyard does state the standard of care is receiving treatment without undue delay. There is a clear schedule laid out in FCI Sandstone's own policy in that, or excuse me, after Mr. Mancini saw Dr. Broadway, FCI Sandstone, in their own medical notes, recommended a 60-day timeline. That itself, in the record on which Dr. Weyard's report is based, that FCI Sandstone really lays out what the scheduled timeline is for the standard of care there. Would that be because it's painful, right, so they want to get them in within 60 days, not because it's going to get worse? Even so, I mean, the standard of care for treating someone in pain is still relevant here. Not having someone who is repeatedly showing up with daily pain, you know, relieving that pain or treating that pain certainly goes into the standard of care of what a reasonable health care professional would do in that case. And further, FCI Sandstone has an internal policy about placing patients who are to receive surgery on MPO or nothing by mouth status 24 hours before they receive surgery. And this is really crucial here because Mr. Mancini is incarcerated. And as such, he's at their discretion. Prisoners aren't told when they're going to be moved. That's not something he can control. He doesn't know if he's going to get surgery, so he wouldn't be able to tell, you know, make the judgment call, I shouldn't eat. That's really completely in control of FCI Sandstone. So the failure to do that really is the critical point at which it made the 60-day timeline impossible. So as such, Mr. Mancini did not receive care on a timely basis without undue delay, which is the standard of care here. As a result, he has suffered this daily pain and permanent injury to his shoulder. Really, the only material fact on which the parties agree here is that this policy wasn't followed and that it was FCI's error, FCI Sandstone's error, that caused the policy not to be followed. As to all the other material facts, the parties essentially disagree on all of them. They disagree as to whether his pain was worsening before his surgery, whether a pre-existing injury informed his pain, whether the surgery was timely, whether the failure to follow a policy stemmed from a lack of supervision at FCI Sandstone, whether Dr. Paul Harvey was even in a place to make medical recommendations for Mr. Mancini, given that he never examined the patient and only visited the FCI Sandstone and the prison a few times in his tenure as regional director. All of these material disagreements as to the factual record point to the conclusion that summary judgment should not have been granted in this case. Because Dr. Wired's report meets the relatively low standards of the Minnesota Med-Mal statute and Federal Rule of Evidence 702, Mr. Mancini would request that the court reverse the district court's dismissal and remand this case for further proceedings. And I will reserve the rest of my time for rebuttal, if that's all. Very well. Thank you. Good morning, Your Honors. Good morning. My name is Luke Dracy, Assistant U.S. Attorney, here representing the United States of America. The plaintiff's expert, Dr. Gary Wired, didn't show his work. Dr. Wired's affidavit provides only broad, empty conclusions, leaving the fact finder here at the district court to speculate about the presence of malpractice and causation. What's missing here? What should he have said that would have gotten past the — I hate to interrupt you, but I couldn't let that one go, which is, what should he have said that would have gotten him past, you know, the causation and gotten it to be admissible? I think the Minnesota — let's start with causation, since Your Honor has already flagged that. Yeah. The Minnesota Supreme Court, just this year in Rigwall, I talked about a case that does meet this standard as to causation. They pointed to Amy Rigwall's expert in that case saying that — pointing to medical studies showing that every hour of delay in providing antibiotics to a patient suffering from — I forget the medical term, but she had breathed in some food. Every hour of delay increases the risk of morbidity and mortality. He pointed to medical studies showing that fact. In this case, I think if Dr. Wired had pointed to medical studies, empirical studies, peer-reviewed, showing that delays of the type and quality that occurred here for patients in Mr. Mancini's condition increased the risks of injuries that he suffered here, I think that would have been good enough at least to overcome on the substantive question of Minnesota law to create an admissible question for the jury on causation. I don't think it would have gotten him to the point of proving those medical studies were reliable necessarily under 702, but it at least would have established something on which a jury or here the district court as the fact finder could conclude without speculating that a delay of this type could have caused the injuries complained of here. What if he just alleged or the expert just said, well, you know, he had this condition and it led to a complete numbness in his hand and he couldn't use his hand for a month? And had they, you know, had they treated him a little earlier and done something, given him a surgery, he wouldn't have lost use of his hand for a month. Would that be good enough? I think that with the numbness, he would have to at the very least describe the numbness and kind of as a temporal relationship with the re-triggering of this injury. So Mr. Mancini comes to Sandstone Health Services on June 30th and says, I was pulling a box out and I had this shooting pain and now I've got numbness in my two fingers. Perhaps with that very close temporal relationship, a reasonable jury could conclude that, you know, there was no intervening cause here. A reasonable jury could accept that very close temporal relationship. But we don't have the temporal relationship between the alleged delay here and Mr. Mancini's permanent injuries and we certainly don't have it without any confounding intervening causes. And so we know from the record that Dr. Broadway, when he recommended Mr. Mancini have this surgery, Dr. Broadway said one of the risks of this surgery is that you suffer nerve damage. We know, and it's undisputed from the record, that Mr. Mancini only suffered certain symptoms such as atrophy and fasciculations about two weeks after the surgery itself. So the surgery, with its known risk of nerve damage, occurs in between the supposed delay here and the permanent injuries. And there's simply nothing in Dr. Wired's affidavit that would allow the district court as the fact finder to disentangle these two competing causes. And frankly, Dr. Wired doesn't even attempt to disentangle those two causes. He doesn't recite any facts about the timing of each of these permanent injuries and when they arose, doesn't recognize the fact that these permanent injuries arose only after the surgery that carries the risk of nerve damage. He doesn't recognize that this surgery carries the risk of nerve damage at all, doesn't discuss it. So all of those facts are essentially undisputed. Perhaps Dr. Wired disputes them. We don't know. Any dispute he might have with those facts is simply not in the record. Counsel, this is Chet Smith. What's your response to the argument made that there was a less drastic remedy available here to have you depose the doctor and clarify these very issues that we're discussing now? Sure. So the Minnesota Supreme Court has, in the 1990 case, that kind of kicks off the line of cases on this topic, discussed what less drastic measures might be available when an affidavit doesn't meet the substantive requirements, or, I'm sorry, doesn't meet the procedural requirements of the statute. Those less drastic measures, the court in Sorensen in that case said, you know, this is a ticket for one ride only. In future cases, plaintiffs need to have their expert affidavits ready to go. And in subsequent cases, in Stroud, in Lindberg, in Anderson, in Teffteller, the Minnesota Supreme Court reverses the court of appeals, saying summary judgment was not appropriate because you need to do less drastic measures. In each of those four cases, the Supreme Court says no, dismissal is appropriate, because under this statute, the legislature has said, without sufficient expert testimony connecting specific facts to conclusions on malpractice and causation, a medical malpractice case under Minnesota law is presumptively frivolous. It's without merit. And what's more, Rule 702 contains, and the summary judgment procedure in which Rule 702 was raised here doesn't have its own built-in less drastic measures. This case had been pending since 2020. The expert deadline had come and gone. The summary judgment deadline, we move for summary judgment on the summary judgment deadline or thereabouts. The plaintiff, under the federal rules, has ample opportunity to move, for example, under Rule 5060 and say, hey, we've got some more facts. Please let us develop those facts. The plaintiff could have submitted another affidavit from Dr. Wired addressing some of these issues. We would have had that fight over whether that was appropriate, but none of those opportunities were taken here. The plaintiff stood on the record that he had created with Dr. Wired's affidavit, and both the magistrate judge and the district judge at the objection stage to the R&R concluded that it simply wasn't enough and that there was no evidence to suggest that more discovery, that a deposition of Dr. Wired would flesh out any of these issues. I really want to discuss the 702 issues here because I think the abuse of discretion standard just makes this such a heavy lift in a case like this. And, you know, nowhere is that more obvious than in the causation opinion. Dr. Wired's causation opinions in paragraph 14 and 15 of his affidavit amount to essentially a statement that there was a string of delays here that resulted in plaintiff's symptoms worsening and, quote, as a result of defendant's deviations, plaintiff has suffered permanent injuries. This is — there is no discussion about — I'm sorry. The district court found no principles and methods underlying this causation opinion. And so the district court couldn't go on and conduct the mandatory reliability analysis that this court is very familiar with in determining whether medical studies are reliable and reliably applied to facts. The district court couldn't determine whether a differential diagnosis had been done that appropriately ruled in surgical delay and ruled out other factors. The court couldn't look to case reports to determine whether those might be applicable in informing Dr. Wired's opinion. There's simply no basis on which the district court could conduct a reliability analysis here. And so without that basis, the district court could not conclude that the plaintiff had met his burden of showing that his expert's opinions were more likely than not reliable and based on sufficient facts. The district court also focused its analysis, in addition to the reliable principles and methods issue, the district court additionally pointed out several mistakes of fact in Dr. Wired's report. I'm sorry, in his affidavit. He discussed Dr. Wired's misreading Mr. Mancini's preoperative MRI. The preoperative MRI indisputably concluded at supplemental appendix 104, there's, quote, no cord compression or abnormal cord signal, end quote. But Dr. Wired concluded that plaintiff's MRI showed spinal cord compression. We simply don't know what that misreading means to Dr. Wired's analysis. His undisclosed opinion may be that the standard of care requires spinal cord compression to be treated with immediate surgery, absent which permanent injury results. If he had said that, then the district court could look at that and say, this lacks sufficient factual basis because it's based on a misreading of the record. We don't know how that misread fact played into Dr. Wired's analysis. And so the district court just had nothing to work with from this affidavit. Dr. Wired also twice misstated the date of surgery, potentially having a typo on the year, but also misstated the date of the surgery. And, you know, when we're talking about a delayed surgery, I think we have to have a correct accounting of the dates at issue. And I don't think that Dr. Wired has shown that he applied the ordinary standard of intellectual rigor to his review of these medical records. One other issue that has come up is this 60 days versus 90 days. And, of course, we conceded at the district court, we concede here, that Mr. Mancini was scheduled to receive surgery on October 18th, but because of an administrative error, he was not placed in SHU. He was not NPO or nothing by mouth. His surgery was rescheduled to November 27th. When he was placed in SHU, he did receive his surgery. And the plaintiff makes a lot out of Dr. Broadway saying he would have had, if it were up to him, he would have had this surgery in one or two days. But Mr. Mancini's testimony on that is that Dr. Broadway said, if it were up to me, you'd have it in one or two days, but scheduling is up to the BOP. Mr. Mancini stated that his surgeon explicitly stated that the timeline of the surgery is up to the BOP. If Dr. Broadway's opinion was that this surgery had an imperative deadline after which permanent injury would result, then he would have said that. It was only after Mr. Mancini had the next day, on August 30th, had an appointment with P.A. Southwick when P.A. Southwick said, there's no timeline here for surgery. Dr. Broadway did not provide a surgical timeline in his initial report, which I want to point the court to. It's not in the appendix, but it is in the district court record. It's at 178-6. This is Dr. Broadway's initial report that contains no timeline for the surgery. It was only after P.A. Southwick reaches out to Dr. Broadway's office that Dr. Broadway says, I recommend 60 days. And then when getting approval for the surgery, Dr. Harvey, the clinical director, provides an approval for that surgery within 90 days. And so it's not enough for Dr. Wire to say, Dr. Broadway concluded the surgery needed to happen as soon as possible to avoid permanent injury, because one, it's not true, and two, even if it were true, he needs to show how the 90-day timeline that occurred here falls beyond what a reasonable surgical patient would have expected their surgery to when that surgery should have happened. And he needs to show in detail how the medical, how the permanent injuries were medically caused by this delay. And I ask the court to affirm on all those grounds. Thank you. Thank you, Mr. Dracy. Rebuttal. I would just like to address a few of the specific points Mr. Dracy made. First of all, Mr. Dracy says rightly that Mr. Mancini chose to stand on the factual record that this case has been going on since 2020. That is definitely true. We, my firm, was referred after that by the Pro Se Project. We chose not to alter his claims, given that it had been so well-developed at that point. But, you know, as such, we are close to the end of discovery. Mr. Dracy also states that, or mentions the errors, the admitted errors in Dr. Weier's report. Isn't that a big deal, though? I mean, maybe not the date of surgery so much, but the spinal cord compression. I'm not a doctor, so I don't know. But I would think that whether it's compressed or not compressed, because I've heard that language in other cases, is a big deal and could contribute to whether he thought surgery was immediately required. That may well be true. I'm not a doctor either, obviously. But, again, that goes to weight, not admissibility. And had Mr. Weier been deposed, perhaps that could have been cleared up. As Mr. Dracy said, that is still an alternative hearing measure that the Court may choose to require opposing counsel to depose Dr. Weier. And Mr. Dracy also said that Dr. Broadway, had it been an actual urgent need for surgery, he would have said that. Again, this is just another characterization of the facts that is improper at summary judgment stage, as all inferences should be drawn toward Mr. Mantini. And lastly, I would just like to reiterate that, again, this case is a very simple one. Mr. Mantini was injured due to string of delays and failure to follow policy and follow the timeline set by FCI Sandstone internally. He suffered injury. Defendants attempt to muddy the waters here by talking about the medical requirements, technical requirements, peer-reviewed papers that Dr. Weier could have included. But the fact of the matter is, this is a very straightforward case. Any hyper-technical measures simply wouldn't be helpful to the jury in this case. And with that, Mr. Mantini, again, respectfully requests that this Court reverse the district court's dismissal and remand this case. Thank you. Thank you. Counsel, the Court thanks you for your appearance and argument today. And case is submitted. We will issue an opinion in due course.